**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-00373-RCL** |
| **DAVID RENE ARREDONDO,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum for the Court's consideration. For the reasons set forth herein, the government recommends the Court sentence defendant David Rene Arredondo ("Arredondo") to 40 months of incarceration followed by three years of supervised release, and order Arredondo to pay $305 in mandatory assessments and $2000 in restitution.

The requested 40-month sentence represents the midrange of the Sentencing Guidelines' calculation for Arredondo, which is 37-46 months of imprisonment at Criminal History Category II.

## I.    INTRODUCTION

Arredondo actively participated in the January 6, 2021 attack on the United States Capitol – an unprecedented attack that interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured over one hundred state and federal police officers, and resulted in over 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered because of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Arredondo joined the siege on the East Side grounds of the U.S. Capitol before the police line was breached at around 2:00 p.m. Arredondo actively participated in and furthered the civil disorder by assaulting police and removing physical barriers that stood in the way of rioters. On the East perimeter line that was created with bike rack fencing and manned by U.S. Capitol Police, Arredondo pushed bike rack fencing against police and forcibly removed bike rack sections to create entry holes for rioters. Once rioters overwhelmed the police on the East perimeter line, Arredondo joined the rioters as they streamed towards the U.S. Capitol building and up the East Rotunda stairs.

By 2:25 p.m., Arredondo stood with other rioters as they attempted to force their way past the police through an open East Rotunda door. U.S. Capitol Police Officer T.M. stood to the right of the East Rotunda door and attempted to close the door to rioters. As Officer T.M. pushed the door, Arredondo assaulted him by grabbing and pulling his left arm. Like Arredondo's removal of bike rack fencing at the perimeter line, Arredondo's assault of Officer T.M. was a clear attempt to stop him from shutting the door to an angry mob.

After assaulting Officer T.M., Arredondo forced his way into the Capitol and proceeded into Statuary Hall. There, he again removed a physical barrier by removing metal fencing that obstructed entry into a hallway. Once Arredondo cleared the fence, he, along with other rioters, moved into a hallway connector until they were stopped by an officer. In the ensuing minutes,

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses because of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

rioters continued to pour into this hallway until Arredondo and others overran the police and moved further into the building. Arredondo continued to move through the Capitol building for another 20 minutes and then exited through the East Rotunda door at around 3:00 p.m.

The government respectfully submits that a 40-month sentence -- which falls within the middle of the recommended guideline range -- acknowledges Arredondo's admission of guilt for every charged count in the Superseding indictment, reflects the seriousness of Arredondo's conduct, will deter Arredondo and others from engaging in similar conduct, and promotes respect for the law.

## II.     FACTUAL BACKGROUND

### A.     Arredondo's Active Role in the January 6, 2021 Attack on the Capitol

#### <u>*Travel to Washington D.C.*</u>

On January 4, 2021, Arredondo traveled from his home in El Paso, Texas, to Washington, D.C., to protest the results of the 2020 federal election. He traveled with two family members, and they stayed at the Capitol Hill Hotel, which is approximately a half mile from the U.S. Capitol building. On January 6, 2021, Arredondo went to the U.S. Capitol and wore khaki pants, a black jacket, red hat, sunglasses, and brown/black gloves.



*Image 1: Arredondo Captured by Hotel Security Footage at 10:58 a.m. on January 6, 2021*

**_Arredondo Engaged the Police and Assisted Rioters to Breach the East Perimeter Police Line_**

At approximately 1:45 p.m., Arredondo joined a large crowd that amassed before bike rack fencing and a line of U.S. Capitol police officers on the East side of the U.S. Capitol.



*Image 2: US Capitol Police Security Footage on East Side*

4

While on the East side, Arredondo stood to the right of rioters who fought officers near the center of the bike rack fencing line. *See Attachment 1,* Time Marks at 2:16 to 3:00[2] (USCP Security Footage on East Side).[3]



***Image 3: US Capitol Police Security Footage of East Side Plaza with Arredondo circled in Red***

About two minutes later, rioters again physically engaged officers in the center of the perimeter line. This time, Arredondo participated by pushing bike rack fencing forward. *Id.* at Time Marks 4:46 to 5:24.

---

[2] Time Mark refer to the video recording time length. For instance, a 2:00 mark represents the 2-minute point of the video during play.

[3] Video attachments will be provided to the Court and Arredondo separately.



***Image 4: Arredondo Physically Engaged with the Police***

Shortly thereafter, Arredondo and another rioter aggressively pushed a bike rack fence section against the police. *Id.* at Time Marks 5:33 to 5:48.



***Image 5: Arredondo Pushed a Bike Rack Fence Section Against Officers***

Arredondo and at least one other rioter then forcibly pulled a bike rack fence section from the police and into the crowd to create a hole in the perimeter line. *Id.* at Time Marks 5:48 to 6:00.



***Image 6: Arredondo Pulled a Section of Bike Rack Fencing from Police***

After removing a bike rack fence section, Arredondo then aggressively reengaged with officers at reformed bike rack fence line as rioters attempted to remove another bike rack fence section. *Id.* at Time Marks 6:01 to 6:32.



***Image 7: Arredondo Reengaged with Police after Removing Fence***

Minutes later, Arredondo aggressively pushed a bike rack fence section, driving officers back as rioters aggressively engaged officers near the center of the perimeter line. *See Attachment 2*, at Time Marks 4:20 to 4:24 (USCP Security Footage on East Side).



***Image 8: Arredondo Forced Officers Backwards***

Attacks on police intensified right before the perimeter line was overrun at around 2:00 PM. *Id.* at Time Marks 4:20 to 4:24. Arredondo participated in the intensified attacks by pushing an officer's hand away, shoving bike rack fencing, and pulling a bike rack fence section to create an opening.



***Image 9: Arredondo Pulled Fencing to Create an Opening for Rioters***

Arredondo and other rioters overran the police at approximately 2:00 p.m. and surged into the East Plaza area. *Id.* at Time Mark 4:52.



***Image 10: Arredondo Moved Forward with Other Rioters as the Police Line Collapsed***

### *Arredondo's Assault of Officer T.M. at the East Rotunda Door*

After overrunning the police line, Arredondo and other rioters moved to the East Rotunda stairs and then up to the East Rotunda doors. At approximately 2:24 p.m., the East Rotunda doors were opened, and rioters attempted to push into the building through a line of Capitol Police officers. Officer T.M. was positioned on the right side of the open East Rotunda door and attempted to shut the door and close it off from further entry by rioters. Arredondo assaulted Officer T.M. by grabbing and forcibly yanking the officer's arm to prevent the officer from closing the door. *See Attachment 3*, (Video of Arredondo's Assault of Officer T.M. at the East Rotunda Door)*.



*Image 11: Arredondo's Assault of Officer T.M.*

U.S. Capitol Police footage, taken from the interior of the East Rotunda door, reflected Officer T.M. attempting to close the doors from rioters. *See Attachment 4* at Time Marks :01 to 1:18 (U.S. Capitol Security Footage of East Rotunda Door).



*Image 12, Officer T.M. is on the Outside and Circled in Yellow*

At approximately 2:26 p.m., Arredondo forced his way into the building after assaulting Officer T.M. *Id.* at Time Marks at 1:18 to 1:28. Officer T.M. remained in the doorway as Arredondo pushed the door towards the officer.



***Image 13, U.S. Capitol Police Security Footage with Arredondo Circled in Red.***



***Image 14, Arredondo Breached the Building at 2:26 p.m. and 29 seconds***

Approximately 20 seconds later, Officer T.M. moved around the East Rotunda door and entered the building.

11



*Image 15, Officer T.M. Entered the Building at 2:26 p.m. and 44 seconds*

<u>***Overrunning of Police Line in Statuary Hall***</u>

Arredondo proceeded into Rotunda after entering through the East Rotunda Door.



*Image 16, Arredondo Walked Through the Rotunda*

Arredondo then traveled into Statuary Hall and joined others in overrunning a police line. *See Attachment 5* at Time Marks:01 to 8:37 (U.S. Capitol Police Security Footage from the Statuary Hall Connector). As with his prior acts to remove obstructions to rioters, Arredondo physically removed fencing in front of the hallway entrance. *Id.* at Time Marks :16 to :28.



***Image 17, Arredondo Walked through Statuary Hall toward Metal Fencing that Blocked the Entryway (In Yellow)***



*Image 18: Arredondo removing Metal Fencing.*

After removing metal fencing that blocked rioters, Arredondo and others entered the corridor. They stopped when they encountered an officer. *Id.* at Time Marks :28 to :45. During the next eight minutes, rioters continued to pile into the hallway while Arredondo stood in front. *Id.*

14

at Time Marks :45 to 8:37. During this time, Arredondo physically gestured towards the police and chanted with other rioters.



*Image 19: Arredondo Standing Before an Officer*

Arredondo and the other rioters overran the officers at approximately 2:48 p.m. and moved further into the building. *Id.* at Time Mark 8:34.



*Image 20: Arredondo and other Rioters Overran the Police Line*

For the next 20 minutes, Arredondo proceeded through the Main Door Hall, House Gallery area, the East Corridor, the Gallery Stairs, and then exited the building through the East Rotunda Door at approximately 3:00 p.m.



*Image 21: Arredondo Exiting the Building through the East Rotunda Door*

### III.   THE CHARGES AND PLEA AGREEMENT

On October 25, 2023, a federal grand jury returned a superseding indictment charging Arredondo with eight counts: Count One, Civil Disorder, 18 U.S.C. § 231(a)(3); Count Two, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1); Count Three, Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); Count Four, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2); Count Five, Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4); Count Six, Disorderly Conduct in a Capitol Building or Capitol Grounds, 40 U.S.C. § 5104(e)(2)(D); Count Seven, Act of Physical Violence in the Capitol Grounds or Buildings, 40

16

U.S.C. § 5104(e)(2)(F); and Count Eight, Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).

On January 3, 2024, Arredondo pled guilty to all charges without a plea agreement.

## IV.   STATUTORY PENALTIES

Arredondo now faces sentencing on all counts charged in the superseding indictment. As to the felony charges, Arredondo faces up to 5 years of imprisonment, a term of supervised release of not more than 3 years, a fine of up to $250,000, and a mandatory special assessment of $100 for Count One (Civil Disorder); and up to 8 years of imprisonment, a term of supervised release of not more than 3 years, a fine of up to $250,000, and a mandatory special assessment of $100 for Count Two (Assault).

As to the Class A misdemeanor charges, Arredondo faces up to one year of imprisonment, a fine of up to $100,000, a term of supervised release of not more than 1 year, and a mandatory special assessment of $25 for Count Three (Entering and Remaining in a Restricted Building or Grounds), Count Four (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), and Count Five (Engaging in Physical Violence in a Restricted Building or Grounds).

As to the Class B misdemeanor charges, Arredondo faces up to 6 months imprisonment, a fine of up to $5,000, a term of supervised release of not more than 1 year, and a mandatory special assessment of $10 for Count Six (Disorderly Conduct in a Capitol Building), Count Seven (Act of Physical Violence in the Capitol Grounds or Buildings), and Count Eight (Parading, Demonstrating, or Picketing in a Capitol Building).

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with U.S. Probation that Arredondo has Criminal History Category II. PSR ¶ 63. However, the government disagrees with the PSR's Guidelines analysis. Whereas the PSR calculated a combined adjusted offense level of 20 before acceptance (PSR ¶ 56), the government calculates a combined adjusted offense level of 23 before acceptance. The government submits that the correct Guidelines analysis is as follows:

Count One (Arredondo's obstruction of USCP Officers on the East Perimeter Police Line):

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1) | Special Offense Characteristic (Physical contact) | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Aggravated Assault Cross-Reference | |
| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

Count Two (Arredondo's assault of USCP Officer T.M. at the East Rotunda Door):

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1) | Special Offense Characteristic (Physical contact) | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Aggravated Assault Cross-Reference | |

---

[4] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs § 2A2.2 (Aggravated Assault) to be applied if the conduct constituted aggravated assault. The Application Notes to § 2A2.2, in turn, define "aggravated assault" as a "felonious assault that involved . . . (D) an intent to commit another felony."   U.S.S.G. § 2A2.2 cmt. n.1.

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

Count Three (Arredondo's entry and remaining on Capitol building and grounds):

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Special Offense Characteristic (Physical contact) | +2 |
| U.S.S.G. § 2X1.1(a) | Cross-Reference (substantive offense is Count One) | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| | **Total** | **14** |

Count Four (Arredondo's disorderly and disruptive conduct in a restricted building or grounds):

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Special Offense Characteristic (Physical contact) | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Aggravated Assault Cross-Reference | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| | **Total** | **14** |

The PSR, in error, did not apply the aggravated assault cross-reference to Count Four, resulting in U.S. Probation calculating Base Offense Level 10 for Count Four (PSR ¶ 42), instead of the correct Base Offense Level 14.

Count Five (Arredondo's engaging in physical violence with Officer T.M. at Rotunda Door):

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Special Offense Characteristic (Physical contact) | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Aggravated Assault Cross-Reference | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |

U.S.S.G. § 3A1.2(b)          Official Victim                    +6

**Total        20**

The U.S. Sentencing Guidelines do not apply to Class B misdemeanors, Counts Six through Eight.

A.    *Grouping Analysis*

Pursuant to U.S.S.G. § 3D1.2(a), there are three separate Groups of the counts of conviction.

Group One consists of Count One, charging Civil Disorder in violation of 18 U.S.C. § 231(a)(3). This offense relates to Arredondo's obstructive conduct with U.S. Capitol police officers attempting to quell a civil disorder on the east side of the U.S. Capitol building. This group also includes Arredondo's physical engagement with USCP Officers at the East Perimeter line, and Arredondo's grab and pulls of USCP Officer T.M. at the East Rotunda door. The offense level for Group One is 20.

Group Two consists of Count Two, charging Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), and Count Five, charging Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4). Each of these offenses relate to Arredondo's assault and interference of USCP Officer T.M., the victim. The offense level for each count is 20, and therefore the offense level for Group Two is 20.

Group Three consists of Counts Three and Four, which charged Entering or Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1751(a)(1), and Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). These counts relate to Arredondo's entering the restricted grounds and U.S. Capitol

Building for which Congress is the victim. The offense level for each Count is 14, and therefore the offense level for Group Three is 14.

The PSR, in error, groups Counts One and Count Two, with the reasoning that the common victim is law enforcement, and the common objective was to stop the certification of the Electoral College Vote. PSR ¶ 32. The government disagrees, in part, with this analysis. The USCP officers who were victims in Count One encompassed different individuals than the single officer, Officer T.M., who is the victim in Count Two. Counts One and Two do not group because they represent separate and distinct harms.

### B.     *Combined Offense Level*

Pursuant to U.S.S.G. §3D1.4(a), "Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious." Here, that calculation yields two units total for Groups One and Two, which each had a Total Offense Level of 20. Additionally, pursuant to U.S.S.G. §3D1.4(b), "Count as one-half Unit any Group that is 5 to 8 levels less serious than the Group with the highest offense level." Here, that adds an additional half unit for Group Three (Total Offense Level 14), for a total of 2 and ½ units for all groups. Pursuant to U.S.S.G. § 3D1.4, if there are 2 ½ units, increase the offense level by 3 levels. This yields a Combined Adjusted Offense Level of 23.

Arredondo pled guilty to all counts in the Superseding Indictment and is entitled to acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. PSR ¶ 53-54. The U.S. Probation Office calculated Arredondo criminal history to be category II. PSR ¶ 63. Accordingly, Arredondo's total adjusted offense level should be calculated as 20, resulting in a guideline range of 37 to 46 months of imprisonment.

### C.     *Aggravated Assault Cross-Reference*

Arredondo argues the aggravated assault cross-reference -- under § 2A2.2 -- should not apply because he grabbed and pulled Officer T.M. to assist Officer T.M. and not with the intent to commit another felony of Civil Disorder in violation of 18 U.S.C. § 231. Arredondo's contention lacks merit.

As described in greater detail in this memorandum, Arredondo actively participated in three events on January 6 that demonstrated his intent to obstruct, impede, and interfere with officers during a civil disorder.

### *Breaching East Perimeter with other Rioters*

The first event involved the defendant's pushing, pulling, and forcible removal of bike rack fencing on the East Perimeter line between 1:45 p.m. – 2:00 p.m. *See* Attachments 1 and 2 (U.S. Capitol Police Security Video from the East Side of the U.S. Capitol. Here are some notable actions by Arredondo in the videos submitted as Attachments 1 and 2.

• [Between the 2:16 and 3:00 Marks in Attachment 1] Rioters began pushing the police in the center of the east perimeter bike rack line. Arredondo was positioned in front of the bike rack fencing and immediately to the right of the physical engagement between the rioters and police.

• [Between the 4:46 and 5:24 Marks in Attachment 1] Rioters again physically engaged the police in the center of the east perimeter line. Arredondo was positioned in front of the bike rack fencing, right of center, and participated by pushing forward against the police line.

• [Between the 5:33 and 5:48 Marks in Attachment 1] Arredondo and at least one other rioter pushed a bike rack fence section against police.

- [Between the 5:48 and 6:00 Marks in Attachment 1] Arredondo and at least one other rioter forcibly pulled a section of bike rack fencing away from the police and into the crowd.

- [Between the 6:08 and 6:32 Marks in Attachment 1] Arredondo pushed bike rack fencing at the police and aggressively gestured towards the police. While Arredondo physically engaged with   police, nearby rioters pulled a section of bike rack fencing away from the perimeter line.

- [4:10 Mark in Attachment 2] Arredondo held the bike rack fencing with two hands and rattled the fencing. Nearby rioters physically engaged with police.

- [Between the 4:21 and 4:24 Marks in Attachment 2] Arredondo forcibly pushed a bike rack fence section into police; driving several police officers backwards into Capitol grounds. Nearby, rioters also began aggressively attacking the police near the center of the perimeter line.

- [Between the 4:29 and 4:40 Marks in Attachment 2] Rioters to Arredondo's left began aggressively attacking police. During this time, Arredondo shoved bike rack fencing, pushed an officer's hand away, and pulled a bike rack fence section from the line to create an opening.

- [4:52 Mark in Attachment 2] Rioters breached the police line and Arredondo rushed forward onto the Capitol grounds with the other rioters.

### Assaulting Officer T.M. to Prevent Him from Closing the East Rotunda Door from Rioters

The second event involved Arredondo's forcible grab and pull of Officer T.M. at the East Rotunda Door, at approximately 2:25 PM. *See* Attachment 3 (third-party video). During Arredondo's assault, the right East Rotunda door was opened and Officer T.M. was trying to close the door from rioters. Here are some notable moments in Attachment 3:

- [:35 Mark in Attachment 3] Officer T.M. was standing to the right of the East

Rotunda door and attempting to close it. A rioter can be observed pushing a U.S. flag through the door opening.

- [1:07 Mark in Attachment 3] Arredondo grabbed Officer T.M.'s left arm and forcibly attempted to pull Officer T.M. from his position.

U.S. Capitol Police Security footage, from the interior of the East Rotunda door, captured Arredondo entering the Capitol Building at around 2:26 p.m. *See* Attachment 4 (USCP Security Footage from East Rotunda Door Interior). The video reflects Arredondo entering the Capitol building while Officer T.M. was still trying to close the door. Here are some notable moments in the video submitted as Attachment 4.

- [:44 Mark in Attachment 4] A U.S. flag is seen being pushed through the open East Rotunda door.   Officer T.M. can be seen through the middle window on the left East Rotunda Door.

- [Between the 1:18 and 1:28 Marks in Attachment 4] Arredondo appeared at the doorway and, after a few moments, slightly pushed the door in the direction of Officer T.M. who was still trying to close the door.

- [1:44 Mark in Attachment 4] About 20 seconds after the defendant enters the building, Officer T.M. moved around the East Rotunda door and entered the building. This video refutes the defendant's claim of assistance as he did not stay at or near the door to assist Officer T.M. after entering the building.

***Removing Metal Fencing and Overrunning the Police Line in the Statuary Hall Connector***

The third event involved Arredondo's conduct at Statuary Hall, about ten minutes after entry into the building. *See* Attachment 5 (USCP Security Video from Statuary Hall). At around

2:40 p.m., Arredondo physically removed a metal fence that blocking the hall entryway. *Id.* at Time Mark :28. Arredondo then moved into the hallway with other rioters. *Id.* at Time Mark :45. Once in the hall, Arredondo stood before the police, chanted with the rioters, physically gestured towards the police who were attempting to prevent further entry, and overran the police line with other rioters. *Id.* at Time Marks :45 to 8:37.

As demonstrated in the attached videos, Arredondo engaged in his conduct with an intent to commit another felony, that is civil disorder. Arredondo physically fought and challenged police, stood by as rioters attacked police officers, forcibly removed physical barriers in and outside of the Capitol building, and chanted and yelled with other rioters at police officers. In addition, Arredondo did not grab and forcibly pull Officer T.M. to help. Instead, Arredondo assaulted Officer T.M. because Officer T.M. was attempting to prevent rioters from entering the building. For these reasons, the government respectfully submits the cross-reference to the aggravated assault guideline is appropriately applied as to Counts 1, 2 and 5.[5]

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[5] Even if the Court rejects the government's argument for the aggravated assault cross-reference, imposing a 27-month term of imprisonment would reflect a just and reasonable sentence when considered with the Section 3553(a) factors. *United States v. Kaufman*, 791 F.3d 86, 89–90 (D.C. Cir. 2015) (declining to remand a sentencing decision where the sentencing judge made clear that he would have imposed the same sentence under the 3553(a) factors regardless of its ruling on a disputed sentencing issue) (citing *United States v. Thompson*, 994 F.2d 864, 868 (D.C.Cir.1993)).

### A.      Nature and Circumstances of the Offense

As shown in Section II(A) of this memorandum, Arredondo's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The seriousness of Arredondo's conduct cannot be overstated. Arredondo aggressively engaged with police who were vastly outnumbered, physically removed barriers to assist rioters in the assault, and assaulted police. The nature and circumstances of Arredondo's offenses were incredibly serious and support the government's recommended sentence of 40 months of imprisonment.

### B.  The History and Characteristics of the Defendant

Arredondo is a former small business owner who is married with two children. Draft PSR ¶¶ 75, 76 and 90. Nearly 30 years ago, Arredondo was a member of a violent gang in Texas and committed the following violent crimes on October 6, 1994:

- Arredondo was convicted of "Disorderly Conduct, Discharge or Display Firearm" and sentenced to 90-days of jail (Dkt. No. 950C08495). In this case, Arredondo and a companion fired 5-6 shots at a victim's residence. Draft PSR ¶ 58.

- Arredondo was convicted of "Deadly Conduct, Discharge Firearm" and sentenced to 10 years imprisonment (Dkt. No. 950D04380) to run concurrently with the Aggravated Assault sentence. In this case, Arredondo shot a victim in the neck. Draft PSR ¶ 59.

- Arredondo was convicted of Aggravated Assault with a Deadly Weapon and sentenced to 10 years imprisonment (Dkt. No. 950D04379). In this case, Arredondo shot a victim in the buttock area. Draft PSR ¶ 60.

While serving his time in prison, Arredondo committed an aggravated assault in 2002:

- On June 6, 2002, Arredondo committed aggravated assault with a deadly weapon while in prison (Dkt. No. 02-12-00142-CRK). Arredondo received a 4-year prison which was ordered to run consecutively to his other sentences. Draft PSR ¶ 61.

26

Based on Arredondo's violent past, his crimes on January 6 were not an isolated event in an otherwise law-abiding life. Arredondo's willingness to commit serious offenses now, at the age of 48, is particularly concerning since his prior convictions and sentences failed to serve as deterrents. Arredondo's violent past weigh in favor of a lengthy term of incarceration.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Arredondo played a significant role in the assault on the U.S. Capitol. He became aggressive with the police, removed physical barriers to further the siege of the Capitol, and assaulted police. Arredondo's willing participation in one of the worst attacks on the U.S. Capitol evidences Arredondo's lack of respect for the law. Judge Berman Jackson stated it succinctly in the *Cronin case*:

> "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power."

*See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

This factor weighs in favor of the prison sentence recommended by the government.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs in favor of a lengthy term of incarceration.

Although Arredondo's criminal history is nearly 30-years old, his history is shockingly violent. In a one-day span in 1994, Arredondo committed numerous violent acts that could have resulted in numerous deaths. Arredondo's lengthy terms of incarceration did little to deter him from engaging in a violent act while in prison, nor did it deter him from participating in an assault on the U.S. Capitol. In addition, Arredondo has not yet expressed remorse for his conduct at the Capitol. For these reasons, Arredondo's sentence must be sufficiently severe to deter him from committing future crimes.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Reed Christensen*, this Court sentenced Christensen to 46-months of imprisonment with 3-years of supervised release and ordered Christensen to pay $2000 in restitution and a $20,000 fine. *See* 21-CR-00455-RCL, Dkt. No. 93. Christensen joined a mob of rioters on the Lower West Plaza of the Capitol grounds and harassed police officers defending the Capitol building. Christensen tried repeatedly to remove a row of metal barriers so that he and the mob could push past the police on the other side, resulting in him being pepper sprayed by officers.

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (Statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

After recovering from the pepper spray, Christensen charged at the officers, assaulting five of them, before the rioters breached the police line. After January 6, Christensen showed no remorse by publishing a book that spread misinformation about the attack and falsely described his conduct on January 6. Christensen also bragged about his participation in the riot when he ran for governor in Oregon.

Christensen was convicted by a jury for violating Title 18, U.S.C., §§ 231(a)(3) (Civil Disorder), 111(a)(1) (3 counts of felony assault), 1752(a)(1) (Entering or Remaining), 1752(a)(2) (Disorderly and Disruptive conduct), 1752(a)(4) (Engaging in Physical Violence) and Title 40, U.S.C., § 5104(e)(2)(F) (Act of Physical Violence).

In *United States v. Kevin Galetto* (21-CR-0517-CKK), the Court sentenced Galetto to 27-months of incarceration with 3-years of supervised release and ordered Sargent to pay $2000 in restitution. *See* 21-CR-0517-CKK, Dkt. No. 69. In this case, Sargent joined the rioters at the West Front of the Capitol, between 2 and 2:40 p.m., after attending the "Stop the Steal" rally. Galetto was one of the first rioters to enter and advance against the police in the lower west terrace tunnel. Galetto committed acts of assault by pushing an officer and attempting to take the officer's riot shield.   Galetto exited the tunnel, re-entered at around 4:15 p.m., and participated in one of the last pushes against the police. On March 30, 2023, Galetto pled guilty to violating Title 18, U.S.C., §§ 231(a)(3) (Civil Disorder), and 111(a)(1) (Assault) pursuant to a plea agreement.

Finally, in *United States v. Jacob Zerkle* (22-CR-0100-RBW), the Court sentenced Zerkle to 24-months of incarceration with 3-years of supervised release and ordered Zerkle to pay $2,000 in restitution. *See* 22-CE-0100-RBW, Dkt. No. 86. In this case, Zerkle, marched with Proud Boys members to the U.S. Capitol building from the National Mall. Zerkle entered the west front of the

Capitol grounds less than an hour after rioters first breached the restricted perimeter. Zerkle then joined the crowd forming near the West Plaza, where he chanted "Hang 'em high" toward the Capitol building alongside other rioters. At 1:59 p.m., when a Metropolitan Police Department civil disturbance unit ("CDU") arrived at the Capitol to reinforce police defenses of the building, Zerkle and other members of the crowd attacked them, blocking the CDU from joining other police officers who were trying to protect the Capitol and its lawful occupants. This occurred at a critical moment just 14 minutes before rioters first breached the Capitol building approximately 50 yards away, at the Senate Wing Door. Dozens of rioters joined in this assault of the civil disturbance unit, but Zerkle was among the most aggressive: he yelled that the officers were traitors, grabbed and shoved them, repeatedly rammed into them, and again called them traitors when police finally expelled him back into the crowd. Zerkle pled guilty to violations of §§ 231(a)(3) (Civil Disorder) and 111(a)(1) (Assault) pursuant to a plea agreement.

The three cases above provide some relevant considerations for Arredondo. For instance, Reed Christensen received a significant sentence of 46-months for conduct like Arredondo (i.e. removal of physical barriers and officer assault). Notably, however, Christensen was charged with multiple assaults, convicted by a jury, and only had a Criminal History Category of I. Arredondo faces sentencing for the same felonies accepted by Kevin Galetto and Jacob Zerkle (Civil Disorder and Assault). Unlike Arredondo, however, Galetto's and Zerkle's sentencings were calculated from Criminal History Category of I.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Since Arredondo pled guilty to offenses under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See*

*Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because Arredondo engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Arredondo responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

In this case, the Court should require Arredondo to pay $2,000 in restitution for his convictions on Counts 1, 2, and 3. This amount fairly reflects Arredondo's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

///

///

///

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court the government requests this Court sentence David Rene Arredondo to 40 months of incarceration, 3 years of supervised release, $305 in mandatory assessments, and order Arredondo to pay $2000 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   *Raymond K. Woo*
RAYMOND K. WOO
Assistant U.S. Attorney
Detailee
United States Attorney's Office
District of Columbia
601 D St. NW
Washington, D.C. 20001
raymond.woo@usdoj.gov
(602) 908-8531 (cell)